**FILED & ENTERED**

APR 15 2019

**CLERK U.S. BANKRUPTCY COURT**
**Central District of California**
**BY Gonzalez DEPUTY CLERK**

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

In re:

Juliana Njeim

_____
                                Debtor(s).

Maryam Seyedan

                                Plaintiff(s),

        v.

Juliana Njeim

_____
                                Defendant(s).

CHAPTER 7

Case No.:  1:17-bk-12238-MT
Adv No:    1:18-ap-01010-MT

**TRIAL MEMORANDUM**

Date:        April 4-April 5, 2019
Time:        9:30 a.m.
Courtroom:   302

        Juliana Njeim ("Debtor") filed a voluntary chapter 7 bankruptcy on August 22, 2017. Maryam Seyedan, a creditor and the plaintiff in this action ("Plaintiff" or "Seyedan"), objects to Debtor's discharge under § 727(a)(4)(A). Plaintiff alleges that Debtor knowingly and fraudulently made material false statements in her original and first Amended Schedules and Statement of Financial Affairs ("SOFA"). The trial focused

on three areas of false statements:

(1) the value of Debtor's home as stated in the original and amended schedule A;

(2) Debtor's statements in the SOFA section 27 and at the 341 meeting of creditors about the dates when her failed company, Beauty Live Forever ("BLF"), existed; and

(3) Debtor's statements in sections 4 and 5 of the SOFA regarding income for years 2015, 2016, and year-to-date 2017.

The following findings of fact and legal conclusions constitute the court's findings under *Federal Rule of Civil Procedure 52(a)*, applicable in this bankruptcy proceeding under *Federal Rule of Bankruptcy Procedure 9014*. To the extent any findings of fact constitute conclusions of law, they are adopted as such. To the extent that any of the conclusions of law constitute findings of fact, they are adopted as such.

## **Findings of Fact**

1.      Debtor has been a full-time waitress at Carnival Restaurant in Sherman Oaks for at least the past ten years.

2.      Plaintiff's lawsuit was filed in 2014 against Beauty Live Forever, Inc., Oilan, Inc. and Michel Kanaan, debtor's husband ("Kanaan" or the "Debtor's Husband"). It did not include Debtor as a party until she was added as a Doe defendant on July 11, 2017, after her husband filed his own chapter 7 petition. The Superior Court Complaint does not mention Debtor's name anywhere in the document.

3.      In the Chapter 7 bankruptcy case filed by Kanaan, on February 16, 2016, Case No. 1:16-bk-10443-GM, Kanaan listed a 100% ownership of the corporation Beauty Illusions, Inc. in his schedules.

4.      Attorney Richard Garber represented Debtor's Husband in his chapter 7 case.

5.      The Debtor's Husband received a discharge in his chapter 7 case entered on May 23, 2016. Plaintiff had filed an untimely dischargeability complaint which was dismissed. The Chapter 7 Trustee, David Seror, filed a no-asset report on July 7, 2017 after doing a FRBP 2004 oral examination of the Debtor here, i.e., Juliana Njeim, on December 20, 2016.

6.      In the 2004 exam in her husband's bankruptcy case on December 20, 2016, Debtor testified that she was President and Vice-president of Beauty Live Forever and that her husband was not an owner. In response to the question of whether Kanaan did any work for Beauty Live Forever she stated that her husband "does the online, like, printing the orders; packing the orders. Many things on the computer." Responding to whether he got paid for the work, she said "No. We don't have a difference between me and him. Whatever we make is for all of us." (Ex.30, pp.977-78.) She subsequently described how she and her husband were still trying to make the BLF business work through other types of sales. (Ex 30 at 981.)

7.      Debtor filed a voluntary Chapter 7 Bankruptcy Petition under Title 11 of the U.S. Code on August 22, 2017 ("Petition Date"). Attorney Richard Garber filed the petition on behalf of the Debtor and represented the Debtor until January 13, 2018, when Kevin Simon of Simon Resnik Hayes LLP was substituted into the case as attorney of record.

8.      Debtor filed her original Schedules ("Original Schedules") and SOFA on September 4, 2017 ("Original SOFA").

9.      In Debtor's Original Schedules, Plaintiff was listed as a creditor in Schedule F with a disputed, contingent and unliquidated claim of $.00. The notation on Schedule F included, "Plaintiff in Case: Maryam Seyedan v. Michel Kanaan (dismissed), Juliana Njeim et al." Plaintiff's pending Superior Court lawsuit against Debtor was listed in Section 9 of the Original SOFA.

10.     Kanaan aided Richard Garber in filling out Debtor's original schedules. Garber called the Debtor several times, but she was at work and could not talk.  She told him to contact her husband.

11.     In Debtor's Original Schedules and Original SOFA, Debtor listed a 100% ownership of three corporations in Schedule "B," to wit: "Beauty Live Forever Inc., (suspended)" "Beaudini Inc." and "Oilan Inc." (collectively the "Debtor Corporations").

12.     In Section 27 of the Original SOFA, Debtor stated that Beauty Live Forever, Inc. existed from "12/19/2011 to 1/2016," Beaudini, Inc. existed from "2/11/2015 to 1/2016," and Oilan, Inc. existed from 5/23/2014 to 1/2016."

13.     The Debtor attended the 341(a) Meeting conducted by Chapter 7 Trustee Nancy Zamora ("Trustee") on September 25, 2017. Plaintiff, her huband, and her counsel attended that meeting. The meeting was concluded and was not continued. At the meeting of creditors, Plaintiff's attorney appeared and asked Debtor about the last date that Debtor or her husband had sold any beauty supplies. Debtor answered "two years ago," and confirmed that there was no activity after 2015. However, she was interrupted immediately by her husband, who was sworn in and corrected her by stating that while the major operation was shut down in July 2015, some sales continued. Kanaan stated: "The last time I knew of the in sale was – it was in mid-2016 I believe

somewhere like that." Plaintiff's attorney then clarified "Mid to late 2016," to which

Kanaan replied "Correct." Ex. 11 at p. 220.

14.    On October 26, 2017, Trustee Zamora requested from Debtor's counsel,

Richard Garber, that he produce the last 12 months of bank statements for the Debtor

Corporations. Mr. Garber replied by e-mail the same day to the Trustee that Debtor did

not have any such bank statements because all accounts were closed. The email

offered that the Debtor would sign a "Stipulation for Debtor to sign, enabling you to

subpoena her bank records" which she ultimately did. The email stated, "That way you

can subpoena whatever bank account statements you want."

15.    On November 10, 2017, Plaintiff served and filed two Rule 2004 Motions

for the production of bank statements and cancelled checks from Bank of America and

Wells Fargo Bank for accounts of the Debtor, her husband Kanaan and the Debtor

Corporations. Both Rule 2004 Motions were granted by Orders entered on November

14, 2017 ("Rule 2004 Orders"), and subpoenas were issued and served to both banks.

Both banks submitted significant amounts of documents to Plaintiff.

16.    Two days after entry of the Rule 2004 Orders, on November 16, 2017,

Debtor filed an Amended Statement of Financial Affairs ("First Amended SOFA") which

changed the ending date of each of the Debtor corporations to "2016," with the notation

"Dates of operation are estimates only."

17.    Beauty Live Forever, Inc., had bank deposits of $269,187 in 2016 and

deposits as late as May 2017.

18.    On March 5, 2018, after the Adversary Complaint had been filed by

Plaintiff, and after the Debtor substituted in Kevin Simon as her attorney of record,

Debtor filed a second Amended Statement of Financial Affairs ("Second Amended SOFA") which changed the ending date of Beauty Live Forever, Inc. to "5/20/2017."

19.     In Section 4 of both the Original SOFA and First Amended SOFA, Debtor listed $35,280 in gross income in 2016 from wages and tips and zero gross income from operating a business. The Second Amended SOFA included further details about receipts from operation of businesses.

20.     Although the Original SOFA did not list income from BLF, BLF's debts, Plaintiff's lawsuit mentioning BLF, and the previous operation of BLF were all mentioned.

21.     Debtor had $71,995 in deposits into her two bank accounts in 2016.

22.     In Section 4 of both the Original SOFA and First Amended SOFA, Debtor listed $34,218.54 in gross income from January 1, 2017 until the Petition Date from wages and tips and zero gross income from operating a business.

23.     In Section 4 of both Debtor's Original SOFA and First Amended SOFA, Debtor did not list any gross income in 2016 or 2017 from her corporation, Beauty Live Forever, Inc.

24.     In Section 4 of both Debtor's Original SOFA and First Amended SOFA, Debtor did not list $9,710 of cash deposits made to her personal bank account for the subject time period in 2017, or an additional deposit of $5,104.51 to her bank account on July 5, 2017. Those amounts were disclosed in her Second Amended SOFA.

25.     On March 5, 2018, after the Adversary Complaint had been filed by Plaintiff, Debtor filed the Second Amended SOFA which listed in Section 4 gross business income of $266,815.27 in 2016 and gross business income of $8,201.17 in

2017. No gross business income was listed for 2015, but the testimony of Kanaan was that the business grossed over a million dollars in the first half of 2015.

26.     On March 5, 2018, after the Adversary Complaint had been filed by Plaintiff, Debtor filed the Second Amended SOFA which listed in Section 4 additional previously undisclosed income from operating a business in 2016 and 2017.

27.     On March 5, 2018, after the Adversary Complaint had been filed by Plaintiff, Debtor filed the Second Amended SOFA which listed in Section 5 additional previously undisclosed "other income" including family contributions of $24,090 in 2016 and $21,060 in 2017.

28.     In Debtor's Original Schedules, Debtor listed her property at 22313 Burbank Blvd., Woodland Hills, CA 91367 ("Debtor's Residence") as having a value of $640,000. On or about September 4, 2017, the same day as the filing of Debtor's petition, Debtor's counsel obtained an appraisal report from Benjamin Horowitz which valued the Debtor's Residence at $640,000.

29.     About two months later, in November 2017, Debtor obtained a second appraisal. The purpose of the appraisal was the Debtor's attempt to avoid the PMI she and her husband were paying to their mortgage lender Ditech. Kanaan informed the appraiser that he wanted to "remove the PMI" from his home payment. There was some indication that Ditech told Debtor that the PMI would not be removed unless Debtors produced an appraisal for $800,000. This appraisal report, by Joseph Adaimy, valued the Debtor's Residence at $800,000. Ditech allegedly did not accept Debtor's appraisal and then obtained its own appraisal for approximately $715,000. Debtor did not amend her schedules when that appraisal was obtained. Ditech did remove the PMI payments.

30.     On November 22, 2017, Plaintiff filed a proof of claim, asserting the amount owed by Debtor to her to be $69,634.58.

31.     In March 2018, Debtor obtained new counsel and once again amended her schedules and SOFA. In her newly amended schedule A, Debtor listed her residence as having a value of $725,000. That amount was based on a Broker's Price Opinion obtained by trustee Nancy Zamora. The trustee decided not to list the house for sale.

32.     At trial, the only witnesses were Debtor and Kanaan.

33.     The Court found Debtor to be credible in her testimony on most topics.

34.     Debtor has limited English reading skills. Kanaan either cannot read or reads very poorly. It appears neither of them had any much formal education. Kanaan' training before he came to this country was solely as a hairdresser. Debtor finished high school and some beauty classes in Lebanon and took some community college classes in the United States shortly after she arrived.

35.     Debtor stated at trial that she either did not read or understand the bankruptcy schedules and related documents she signed in connection with this case. At her 341(a) meeting, she stated that she had read the documents before she signed them. Debtor's counsel received $3500 for preparing her bankruptcy documents, yet it was undisputed that, in preparing the documents for her bankruptcy, debtor's attorney had communicated primarily with Kanaan. Debtor stated that her attorney did not ask her when the business shut or whether they still exist. The information in the SOFA generally came from Kanaan. When Debtor signed the documents, her attorney had flagged the various places where a signature was needed but did not explain the contents of the case commencement documents to Debtor. No one reviewed the

documents to be sure she understood them before they were filed. Debtor relied heavily on Kanaan and attorney Garber to ensure the truthfulness of her bankruptcy documents. When asked about the contents of her schedules and SOFA, Debtor repeatedly answered that she was sure that Garber received all the necessary documents and that her husband could answer the questions better than her.

36.    The business was formed in Debtor's name, rather than jointly with Kanaan, because she had much better credit than he did. She and Kanaan were able to use her credit to purchase more inventory and conduct a higher volume business. Debtor appeared to have a very general idea of how the business was being run, but was generally fine with having her husband do anything in her name and to sign wherever he told her to.

37.    Kanaan conducted the bulk of the operations of Debtor's solely owned business, though he did not have any official position. The couple planned to have Debtor continue her work as a waitress to pay the bills while Kanaan expanded the business over a few years, eventually allowing Debtor to leave her job as a waitress and take a more active role in BLF's operations. When asked for details about BLF's operations, Debtor often stated that she did not know and that those questions should be directed at her husband. Kanaan's testimony demonstrated that he was very knowledgeable about Debtor's business. His testimony generally on the operations and fate of the company were credible. He exaggerated somewhat his inability to read and understand written documents and generally failed to take responsibility where he could blame actions on others. There was no basis, however, to believe he was not the one truly in charge of the company and keeping track of the details.  He appeared to have whatever limited business background the company possessed and had convinced his

wife that he knew what he was doing. He also had a beauty product business predating

his relationship with the debtor. His professed expertise and dream of a successful

beauty products distribution business appears to have been the basis of the Debtor's

reliance on him to finally pull her out of working as a restaurant waitress.

38.     BLF, conducted substantial sales in 2014-2015. The bulk of the sales

were conducted through Amazon.com, though BLF also sold beauty products wholesale

to local stores. By mid-2015, Plaintiff and Kanaan's ex-wife were both engaged in

litigation against Kanaan. While limited details were given on that litigation, it began to

affect BLF's business. In July 2015, Amazon suspended BLF's ability to conduct sales

on its platform because, as Kanaan explained, there were "many subpoenas on the

account" relating to the litigation against Kanaan. At some point in the months following

July 2015, Amazon reopened BLF's account for two days. Kanaan glossed over these

problems and acted simply as though Amazon was unreasonable in not wanting a

vendor embroiled in litigation.

39.     Debtor and Kanaan were unclear in late 2015 about whether Amazon

would reinstate BLF's account. It was in this period that Debtor purchased, with the help

of a loan from a family friend, Debtor's Residence.

40.     When it became clear that Amazon was not going to reinstate BLF's

account in late 2015 and early 2016, Kanaan tried several other methods of increasing

their sales. BLF sold product through Jet, Ebay, and attempted to build its own website.

The BLF website had repeated errors and required significant expense to attempt to

create. None of the other platforms allowed BLF to obtain the volume of sales it had

reached on Amazon, and it is not clear that there were any profits after Amazon

cancelled BLF's account.

41.    Debtor and Kanaan reached some sort of understanding in late 2015 that the business would shut down in 2016. It was not clear what the timeframe was to wind up the business. Debtor claims she thought of it as over about that time. A relatively modest amount of business continued for most of 2016, as Kanaan testified at the 341 meeting of creditors. Debtor testified that her statement at the 341 meeting that there were no more sales after July 2015 was a reference to the sales on Amazon. Debtor's statement in the original SOFA was a reference to the date she and Kanaan agreed to shut down the business.

42.    The deposits in BLF's bank account indicate that sales continued for some time after July 2015. As there was no clear connection drawn of which sales connected to which receipts, the bank account is not a good indicator of when BLF sold products. Kanaan testified that there was often a delay between sales and payment, and that the delay generally depended on the platform or business that BLF was selling to. Cash withdrawals from the bank account were often the result of a purchaser who would not accept checks from BLF because there was no established business relationship or there had been earlier difficulties with payment. Certainly, Kanaan removed cash and some was used for his family's living expenses as well. Kanaan and Debtor claimed these withdrawals were "loans," although no records of loans were made or recorded on tax returns.

43.    Debtor received certain bank deposits that were contributions from family members. Debtor's original schedule I indicated that Debtor received contributions as needed from her son (age 23) and daughter (age 25), both of whom reside at Debtor's Residence. The original schedule I anticipates a $500 per month contribution from each of them.

44.     While the bank records do not specify which bank deposits were contributions from Debtor's children or other family, Debtor's testimony was credible on this topic. When asked about the contributions from her children, she expressed regret that she had to ask her children for help paying bills such as electricity and the mortgage. Debtor stated twice that 2016 was the worst time of her life. Her bank records would appear to corroborate these financial circumstances.

45.     Exhibit 19 is Debtor's application for the home loan from October 8, 2015, that financed the purchase of Debtor's Residence. In the application, Debtor states that she has an income of $2,597 per month from her employment as a waitress, but she also states that she earns $11,277 per month as her base employment income from working for BLF.

46.     The loan application was completed using BLF's 2014 tax returns. Those tax returns were completed the same day as the loan application, October 8, 2015. It appears that Debtor and Kanaan had BLF's taxes calculated in such a way that Debtor could obtain a loan to purchase a new home. Debtor admitted that she knew the accountant was simply providing sufficient income to justify the home loan they were applying for.  She did not provide any basis for such income, and the loan application appears to be unsubstantiated.

47.     The 2014 tax return seems inconsistent with the amount of income stated in connection with this bankruptcy, although 2014 income is not included in this 2017 bankruptcy case. While the SOFA does not request a statement of Debtor's income for 2014, it is unlikely that Debtor was realizing $11,277 per month in income from BLF.

**<u>Conclusions of Law</u>**

The basis for nondischargeability alleged in the complaint is 11 U.S.C.

§ 727(a)(4)(A). There are three elements to an action under § 727(a)(4)(A): (1) Debtor made a false statement or omission, (2) regarding a material fact, and (3) did so knowingly and fraudulently. In re Khalil, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007); In re Retz, 606 F.3d 1189, 1197 (9th Cir. 2010). The standard of proof the plaintiff bears is a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 289 (1991); In re Lawler, 141 B.R. 425, 428–29 (9th Cir. BAP 1992). Black's Law Dictionary defines this standard as "the greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force; superior evidentiary weight that, though not sufficient to free the mind wholly from all reasonable doubt, is still sufficient to incline a fair and impartial mind to one side of the issue rather than the other. This is the burden of proof in most civil trials, in which the jury is instructed to find for the party that, on the whole, has the stronger evidence, however slight the edge may be." PREPONDERANCE OF THE EVIDENCE, Black's Law Dictionary (10th ed. 2014). Discharge provisions are also liberally construed in favor of debtors and strictly against the person objecting to discharge. Khalil, 379 B.R. at 173.

The pretrial stipulation raised the issue of whether a creditor scheduled with a disputed claim has standing to file a Complaint objecting to Discharge under 11 U.S.C. Section 727, but this was not raised further at trial.  Plaintiff does have standing to object to discharge with only a disputed, contingent, or unliquidated claim. In re Andrews, 239 F.3d 708, 710 (5th Cir. 2001).

1)  False Statement or Omission

A false statement or omission in debtor's bankruptcy schedules or Statement of Financial Affairs can constitute a false oath within the meaning of § 727(a)(4). In re

1    Khalil, 379 B.R. at 172. "The fundamental purpose of § 727(a)(4)(A) is to insure that the

2    trustee and creditors have accurate information without having to conduct costly

3    investigations." Id.

4      The allegation is that Debtor made certain misstatements in the Original and First

5    Amended SOFA's. They fall into three categories:

6       a. The value of Debtor's Residence

7       b. When Debtor's business existed

8       c. Debtor's income in the years before bankruptcy

9     *a. The Value of Debtor's residence.*

10      With respect to the value of Debtor's Residence, Plaintiff has not carried her

11    burden of proving that there was, in fact, a misstatement "in or in connection with" the

12    case with respect to the value of the Debtor's Residence. The original schedule A

13    disclosed a value of $640,000. That valuation was supported by a professional

14    appraisal and was slightly higher than the purchase price of $620,000 two years earlier.

15    Plaintiff argues that Debtor should have amended the value two months later when she

16    obtained a second appraisal for $800,000—specifically, attorney for Plaintiff argued that

17    Debtor should have "split the difference" between the two appraisals.

18      The second appraisal was obtained solely for the purpose of removing the PMI

19    from the home, and the appraisal did not reflect the true value of the Debtor's

20    Residence. When asked about the $800,000 appraisal, Kanaan's demeanor indicated

21    that there was an understanding with the appraiser that Kanaan and Debtor wanted a

22    certain value, "to remove the PMI." The Court will not opine whether this conduct

23    constitutes some other unlawful act. A willingness to make false statements to third

24    parties with respect to her property does affect the Court's judgment of Debtor's

credibility. However, the Debtor did not rely on this appraisal in connection with her

bankruptcy case, and perhaps with good reason. Every other indication is that the

property was not worth $800,000. Ditech did not accept the inflated appraisal. The

chapter 7 trustee had her broker look at the property and valued it at around $725,000.

Debtor then amended her schedule A to reflect the value provided by the trustee. It is

not even clear that $725,000 is the correct value of the home. Trustee obtained the

opinion of a broker, but there does not appear to have been a full appraisal conducted

by the trustee. Even assuming a $725,000 market price, there was still no equity

remaining for the trustee to liquidate after subtracting encumbrances and exemptions.

Plaintiff has not shown that Debtor's statement that the valuations of either

$640,000 or $725,000 were false. Debtor's initial valuation in the Original SOFA was

based upon a professional appraisal. There has been no indication that the appraiser

intentionally presented a low appraisal, or that Debtor knew that the appraisal was

incorrect at the time. While there is clearly a discrepancy between trustee's valuation

and Debtor's first appraisal, this is more of a professional disagreement than a clear

false statement.

   b. *Dates that Debtor's business existed*

Section 27 of the SOFA asks debtors to identify all businesses they have owned

in the past four years, to describe the nature of the business, any accountant or

bookkeeper, the EIN, and the "Dates business existed." Debtor's initial SOFA stated

that the businesses (of which BLF was the most active) existed until "1/2016." At

Debtor's 341(a) meeting of creditors, Plaintiff's attorney asked a similar question

regarding the last date time that Debtor or Kanaan had sold any beauty products.

Debtor initially answered "July 2015," the date that Amazon cancelled BLF's account,

but Kanaan immediately interrupted and, with permission from the trustee, answered that some sales continued until "around mid-2016." Exh. 11. In a follow up question, that answer was further clarified to "mid to late 2016." Kanaan also provided clarification that the "major sales" shut down in July 2015. Id.

After Plaintiff requested a 2004 exam seeking the bank records of Debtor's businesses, Debtor filed the First Amended mended SOFA stating that the dates the business existed was until "2016" and noting that "(Dates of operation are estimates only)." Plaintiff argues that Debtor was effectively caught in a lie when forced to turn over bank records that show that the business operated beyond January 2016. However, Debtor repeatedly testified at trial that she and Kanaan reached the decision to shut down the business in January 2016.

Debtor's counsel argues that the phrase "Dates business existed" is somewhat ambiguous. The Court cannot identify any law interpreting this phrase. A non-insignificant amount of business continued beyond January 2016. In 2016, around $260,000 came in to BLF's accounts. Sales continued as late as mid-to-late 2016. Whether new product was ordered, or there was any actual profit is unclear. Later amendments attempted to clarify the actual dates the business existed, but exactly what is meant by "existed" is open to some discussion.

There is sufficient evidence to establish that Debtor's statement on the original SOFA, that the business only existed until January 2016, was actually false. Whether it was stated intentionally is discussed below.

### c. Debtor's Income in SOFA

Section 4 of the SOFA asks debtors to disclose any income they have received from employment or operation of a business during this year or the two previous

calendar years. Section 5 of the SOFA asks debtors to disclose any other income for the same time period. Debtor's original SOFA only reflected income from her waitressing position for these years. However, it is undisputed that during 2017, Debtor received cash deposits of $9,710 plus an additional cash deposit of $5,104.51. Pre-Trial Stipulation ¶ 20. These amounts were disclosed in Debtor's Second Amended SOFA. Id.

Furthermore, it is undisputed that Debtor had $71,995 deposited into her two bank accounts in 2016, Pre-Trial Stipulation ¶ 17, though her original SOFA reflects only $35,280 in income for all of 2016. Debtor's second amended SOFA was updated to reflect the following "other income" under section 5: family contributions of $24,090; Misc refunds of $872.47; 2015 tax refund of $9,152; transfers from savings accounts of $700; and overdraft protection of $126. The total of this "other income" plus Debtor's wages is $70,220, a number which is very close to the $71,995 total 2016 deposits. Some of this "other income" is not, in fact, income. Debtor seems to have included non-income items in the second amended SOFA specifically to address the disparity between her wage income and the deposits in her bank account.

However, there is sufficient evidence to establish that section 4 and 5 of her Original and First Amended SOFA contained omissions. Debtor testified that she received financial help from her family, and while that assistance was reflected in her schedule I, it was not included as other income for those years.

2) Materiality

A false statement or omission must be material to the bankruptcy case to provide grounds for a denial of discharge. In re Khalil, 379 B.R. at 172.  A fact is material "if it bears a relationship to the debtor's business transactions or estate, or concerns the

1   discovery of assets, business dealings, or the existence and disposition of the debtor's

2   property." In re Retz, 606 F.3d at 1198. An omission or misstatement that "detrimentally

3   affects administration of the estate" is material. Id. (denying discharge under

4   § 727(a)(4)(A) where debtor omitted information relating to his assets, property, and

5   business dealings, making it almost impossible to reconstruct his financial affairs). A

6   false oath may be "material" even though it does not cause direct financial prejudice to

7   creditors. In re Wills, 243 B.R. 58, 63 (B.A.P. 9th Cir. 1999).

8    Here, Debtor has made misstatements and omissions regarding the amount of

9   income she received in the years leading up to the bankruptcy and regarding the dates

10  her business existed. By indicating on her original SOFA that the business no longer

11  existed as of January 2016, she failed to provide a full and accurate picture of her

12  financial circumstances. The omission regarding the dates the business existed bear a

13  relationship to creditors' and the trustee's ability to discover business dealings that

14  occurred after that date.

15   The Court notes, however, that the failure to disclose the gross income of the

16  business is probably not material nor is it clearly required under the SOFA. See Id.

17  (Omissions or misstatements concerning property that would not be property of estate

18  may not meet "materiality" requirement of "false oath" exception to discharge.)

19   The alleged false statement about the value of her residence was, as explained

20  above, not clearly false.  To the extent that Debtor could have amended or stated that

21  she had some reason to believe the house was worth more, the statement would be

22  material. The trustee stated at the 341 meeting that she would send out her own broker

23  to evaluate the house and made arrangements to do so, indicating that she

24  independently verified values claimed by debtors. Once debtor was clearly on notice

1   that the value might be wrong, she did amend.

2        The Plaintiff has met her burden of showing that the false statements or

3   omissions were material.

4        3) Knowingly and Fraudulently

5        The "knowing and fraudulent" intent standard of § 727(a)(4) means that Debtor

6   must have actual (not constructive) intent in concealing records or making an omission

7   in schedules.  In re Wills,  243 B.R. at 64.  Fraudulent intent may be proved by

8   circumstantial evidence, and reckless disregard combined with other circumstances

9   may support an inference of fraudulent intent. See Matter of Sholdra, 249 F.3d 380, 382

10  (5th Cir. 2001); In re Khalil, 379 B.R. at 174; In re Retz, 606 F.3d at 1199; Stamat v.

11  Neary, 635 F.3d 974, 982 (7th Cir. 2011) (reckless disregard shown where debtors who

12  failed to disclose business interests were highly educated and had significant business

13  experience).

14       Plaintiffs argue that reckless indifference to the truth is sufficient to establish the

15  mental state required by § 727(a)(4)(A). The Khalil and Retz case state the rule clearly.

16  "Reckless indifference or disregard for the truth may be circumstantial evidence of

17  intent, but is not sufficient, alone, to constitute fraudulent intent." In re Retz, 606 F.3d at

18  1199. However, the "bankruptcy court *may* find that debtor acted with requisite

19  fraudulent intent where there has been a pattern of falsity or from debtor's reckless

20  indifference to, or disregard of, the truth." In re Khalil, 379 B.R. at 174 (emphasis in

21  original).

22       The fact that Debtor amended her schedules does not excuse her from full

23  disclosure at the time of filing the initial schedules and Statement of Financial Affairs. In

24  re Shoemaker, No. 1:14-AP-01206-GM, 2018 WL 300524, at *14 (Bankr. C.D. Cal. Jan.

4, 2018); In re Beauchamp, 236 B.R. 727, 734 (B.A.P. 9th Cir. 1999), aff'd, 5 F. App'x

743 (9th Cir. 2001) (no error in denying discharge under § 727, even though debtor

amended schedules, where bankruptcy court found that the amendment was motivated

by the setting of a Rule 2004 examination); In re Cummings, 595 F. App'x 707, 709 (9th

Cir. 2015)(chapter 7 debtors' eventual disclosure, on their third amended Schedule B, of

their interest in a limited liability company (LLC) did not negate their initial fraud for

discharge denial purposes).

The Court agrees that Plaintiff has established that Debtor was certainly acted

with disregard for the truth by signing numerous documents without personally verifying

that the contents of those documents were accurate. The question before the Court is

whether those apparent acts conducted with disregard for the truth are evidence that

the Debtor in fact knew that her schedules were incorrect but nevertheless signed them

with fraudulent intent.

Plaintiff relies heavily on Khalil's explanation of motive, stating that:

> Motive can support a finding of knowing and fraudulent
> intent, but it is not indispensable. A bankruptcy court might
> find that a debtor's reckless indifference to the truth is part of
> an attempt to fly 'below the trustee's radar screen' (Searles,
> 317 B.R. at 377), or to protect family or friends from intrusive
> discovery or preference or fraudulent transfer actions, or
> simply to make investigation difficult for the bankruptcy
> trustee or creditors."

In re Khalil, 379 B.R. at 176. Plaintiff argues that Debtor, similar to the debtor in Khalil,

had a motive for not disclosing income from her business and the date that the business

operated. Plaintiff argues that Debtor wanted to "fly below the trustee's radar screen"

and "protect family or friends from intrusive discovery." Debtor's response is that she

knew she would be "flyspecked" following the extensive investigation into her husband's

bankruptcy and endeavored to include as much detail as possible. In Khalil, the

bankruptcy court "found that Debtor made numerous, substantial, and conscious

omissions from his bankruptcy schedules and statement of financial affairs, that

Debtor's explanations were not persuasive, that he chose not to correct these

inaccuracies when he had the opportunity, and that he had the requisite intent to

deceive." In re Khalil, 379 B.R. at 177. Similarly, Plaintiff argues that Debtor failed to

correct the date the business existed until Plaintiff sought a 2004 examination, and that

Debtor did not make any changes to her previous income until after Plaintiff filed her

complaint.

        Debtor's argument is more persuasive as to a motive for the misstatements. The

debtor and her husband had already been examined extensively under oath in husband

Kanaan's bankruptcy case. Over a thousand pieces of paper were turned over to the

trustee in his case, including a lot of bank and other financial records. Although it

appears the records turned over were not entirely complete, the 2004 exam transcript of

Debtor in Kanaan's case indicates that the trustee had a good idea of the family's

finances from 2015 through 2016, the names under which they operated businesses

and what they owned. No evidence was introduced to show that there was an incentive

to hide anything from creditors or the trustee.  There were no assets in the estate to be

sold at the point the Debtor's case was filed. Any relatively small transfers of cash in

previous years appeared to be either part of paying business expenses or payments of

debts based on loans from family members. Two trustees were carefully looking for

income for the estate, and none of the alleged false statements kept them from that

inquiry. The fact that the business records were somewhat messy and debtor did not

keep paper copies of all bank records better explains the trustee's further inquiries than

the bad motive Plaintiff alleges.

1    Plaintiff also relies on In re Jakovljevic-Ostojic, which states that Debtor's lack of

2   candor or completeness in filing schedules is an indication of bad faith. 517 B.R. 119

3   (Bankr. N.D. Ill. 2014). While certainly true, Jakovlejevic-Ostoiic was a dismissal for bad

4   faith, which is a lower standard than denying debtor a discharge under § 727(a)(4).

5   There is no provision under § 727 to allow denial of discharge for "bad faith." Similarly,

6   Plaintiff's reliance on a debtor's duties to schedule things properly arise under § 521.

7   Cusano v. Klein, 264 F.3d 936, 945 (9th Cir. 2001)("The bankruptcy code placed an

8   affirmative duty on Cusano to schedule his assets and liabilities.")  While the debtor's

9   duties under §521 do inform § 727, the failure to fulfill that duty must still be evaluated

10   through the prism of whether it was done "knowingly and fraudulently."

11    The critical question here is whether Debtor had the requisite intent - did the

12   Debtor really rely on others or did she knowingly and fraudulently misstate the value of

13   her home, the dates BLF existed, and her income? Her background provided little to

14   demonstrate any knowledge of finance, business or complicated documents.  She was

15   trained as a beautician in Lebanon, and has worked as a homemaker and waitress

16   since arriving in the United States.  She emigrated to this country in 2004,

17   approximately 14 years before the bankruptcy filing. She evidenced some confusion

18   understanding certain phrases in her 341(a) testimony and at trial. She had difficulty

19   sometimes in expressing herself in English.  While Debtor did speak "everyday" English

20   or conversational English, that is different than reading court documents or answering

21   questions in a sworn examination.

22    While it is always hard to gauge how much a person understands when she has

23   language and literacy challenges, the court was persuaded by observing both the

24   Debtor and her husband that they did have some limitations in both reading and

speaking English. They were not careful and thorough in how they approached the

Debtor's Schedules and SOFAs. There was, however, no evidence that their attorney

reviewed that responsibility with them and made sure the Debtor understood and

agreed to each representation on the documents.  That is a difficult job for counsel

where a debtor speaks English as a second language and reads poorly, but it is even

more important in such a situation.

Defendant relies on In re Cox, 41 F.3d 1294 (9th Cir. 1994), to argue that a

wife who relies on a husband to take care of things may be found not to have the

requisite intent under § 727. The Cox case was significantly different from what

was presented here, but it generally reinforces that a Debtor's discharge cannot

be denied under § 727 for actions taken by her spouse without her knowledge.

Debtor also stated that she relied on her attorney. "Generally, a debtor

who acts in reliance on the advice of his attorney lacks the intent required to

deny him a discharge of his debt," as long as that reliance is in good faith. In re

Adeeb, 787 F.2d 1339, 1343 (9th Cir. 1986). The evidence was that her attorney

had prepared both her husband and her bankruptcies. Before preparing her

case, he had participated in numerous examinations and document productions

in the husband's case about essentially the same topics, and had obtained a

discharge for her husband after extensive inquiries by this Plaintiff and the

trustee. He had made numerous phone calls to her husband to verify information

for the bankruptcy filing. He even obtained an appraisal to support the value of

their residence.

Her testimony that she relied on her husband and her attorney to provide

the details needed for the bankruptcy documents was credible. Given that she

was working full time as a waitress while her husband ran the business, and her

general credibility with respect to her ignorance on financial matters, it seems

that Debtor was in fact relying on her attorney and her husband in good faith.

Kanaan was much more involved in the family's financial operations than Debtor

was, so it is unsurprising that he would be at least a necessary source of

information in filling out Debtor's bankruptcy paperwork. When asked why she

trusted her husband's numbers on the petition and schedules, she testified that

she would "trust him to death."

In 2019, it is not sufficient for a female debtor to avoid responsibility by saying

she counted on her husband to take care of everything. Here, however, the Debtor had

limited formal education, did not speak English well and thought an experienced

bankruptcy attorney already knew a lot about her finances from the previous case he

did for her husband. She also was extremely stressed about her financial circumstances

for over a year before filing bankruptcy.  The outside observer might wonder how she

trusted her husband to first handle the beauty supply business and then the bankruptcy

filing after a few other failed businesses, but she viewed the situation as the only way

out of her waitress job and taking advantage of his business experience. She also was

aware that his bankruptcy case had gone through to a discharge.  Her reliance is

credible and a significant factor in showing that the representations were not made

knowingly and fraudulently.

There is no doubt that Plaintiff incurred significant expense in obtaining

documents from Bank of America and Wells Fargo Bank to attempt to establish the

falsity of Debtor's sworn statements concerning her income and her businesses.  Her

efforts are understandable, given the claim she had against Debtor's Husband that she

was precluded from pursuing further. A fair reading of this evidence, however, leaves

the court with the firm impression that Plaintiff's dispute is really with Debtor's husband,

and she is attempting to interpret sloppy schedules as knowing and fraudulent false

misstatements.

There is an assumption that when a debtor fails to disclose income, it is an

indication that the debtor is more financially healthy than they appear. Here, the

opposite is the case. Debtor's undisclosed family contributions were a sign of the

Debtor's financial distress in the wake of a failed business enterprise. The need to

request funds from her children in order to pay bills undercuts Plaintiff's implication that

Debtor was secretly realizing significant profits from her companies. The nature of

Debtor's business as a distributer requires a significant expense for cost of goods sold,

such that the gross income of the business is a misleading indication of the business's

success. Deposits in bank accounts can similarly be a misleading indication of income,

as a tax refund of $9,152 represents income from the previous year.

### Conclusion

For the reasons stated above, Debtor's discharge will not be denied under 11

U.S.C. § 727(a)(4)(A). A judgement will be entered in favor of the defendant. Defendant,

as prevailing party, should submit one.

This is not a welcome conclusion where a debtor has shown such a willingness

to lie previously or rely on others who are lying on her behalf.  Whether a debtor has

previously lied or associates with liars goes to judging credibility, but it does not control

the outcome in a dischargeability action.  The totality of the circumstances must be

considered along with the specific elements detailed in § 727(a)(4)(A). Requiring that

acts be done "knowingly and fraudulently" means that recklessly filled out schedules

must be amended, may even result in a dismissal, and certainly create more work for all concerned, but more is required to deny a discharge.

###

Date: April 15, 2019

Maureen A. Tighe
United States Bankruptcy Judge